## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,** | : | **Civil No. 1: CV-06-0082** |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **EDWARD G. RENDELL, Governor of the Commonwealth of Pennsylvania, et al.,** | : | |
| **Defendants.** | : | |

## M E M O R A N D U M

This cases arises out of a dispute over whether Plaintiff, West Virginia University Hospitals, Inc. ("WVUH" or "the Hospital"), is entitled to trauma disproportionate share hospital ("Trauma DSH") payments under the Pennsylvania Trauma Systems Stabilization Act, 35 P.S. §§ 6943.1 *et seq.* ("Trauma Act"). Defendants are certain Pennsylvania state officials—Edward G. Rendell, Governor of the Commonwealth of Pennsylvania; Estelle B. Richman, Secretary of the Department of Public Welfare; and James Hardy, Deputy Secretary for Medical Assistance Programs. The State has not made Trauma DSH payments to WVUH since the Trauma Act was passed in March 2004. WVUH asserts that Defendants' failure to do so violates the Commerce Clause, the Equal Protection Clause, the Medicaid[1] statute and regulations, and this court's October 18, 1990 order, *W. Va. Univ. Hosps., Inc. v. Casey*, No. 86-cv-0955, slip op. (M.D. Pa. Oct. 18, 1990).

---

[1] Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396 *et seq.*

Presently before the court are WVUH's Motion for Summary Judgment (Doc. 22) and Motion to Enforce Judgment (Doc. 25). Because the court finds that Defendants have violated both the Equal Protection Clause and the Commerce Clause, summary judgment will be granted in favor of Plaintiff. However, because the type of payment at issue here was not in existence at the time of the court's previous order, the Motion to Enforce Judgment will be denied.

I.      **Background**

A.      **Statutory Framework**

Medicaid, in accordance with the Medicaid Act, provides for the payment of medical services to the poor, elderly, and disabled. *Children's Seashore House v. Waldman*, 197 F.3d 654, 655 (3d Cir. 1999). Unlike Medicare, which is administered nationally and federally funded, the Medicaid program is jointly funded by the state and federal governments and administered by the individual states that choose to participate in the program. States that seek federal Medicaid funds must submit a state medical assistance plan ("State Plan") to the U.S. Secretary of Health and Human Services. The State Plan explains the state's coverage rules and describes the methodology it will use to reimburse institutional health care providers for the services they render to Medicaid recipients. The State Plan must be approved by the Centers for Medicare and Medicaid Services, part of the U.S. Department of Health and Human Services, the federal agency responsible for administering the Medicaid program. Only expenditures made under an approved State Plan are eligible for matching federal payments.

Pennsylvania participates in the Medicaid program, and its State Plan is administered by the Pennsylvania Department of Public Welfare ("DPW"). Federal

2

fiscal participation in the Pennsylvania Medical Assistance program is approximately 54%. The remaining 46% of funds come from Pennsylvania. The Pennsylvania State Plan for reimbursement of acute care general hospitals such as WVUH is found at Attachment 4.19A of the Pennsylvania State Plan. Attachment 4.19A provides that an out-of-state acute care general hospital that treats, in any one fiscal year, more than 400 Pennsylvania medical assistance inpatients shall be paid in accordance with methods and standards applied to in-state hospitals for acute care services.

### B.   Facts

The following facts are undisputed except where noted. WVUH is a university-affiliated teaching hospital located in Morgantown, West Virginia, approximately six miles from the border between West Virginia and Pennsylvania. The Hospital serves as the primary teaching hospital for the West Virginia University School of Medicine. It is a major academic medical center that devotes substantial resources to the training and education of health care workers, including health care professionals who live and work in Pennsylvania.

Due to its proximity to the Pennsylvania border, WVUH has treated, and continues to treat, more than 400 Pennsylvania medical assistance inpatients per fiscal year.[2] Thus, WVUH is covered by Attachment 4.19A's provision for payment

---

[2] The border counties of Fayette and Greene in Pennsylvania are within WVUH's service area. In addition, WVUH serves residents of Washington County, Pennsylvania. The only hospital located in Greene County is Southwest Regional Medical Center, a 45-bed hospital that is located approximately 25 miles from WVUH and 50 miles from Pittsburgh, Pennsylvania. The largest of three hospitals located in Fayette County has 206 staffed beds and is located approximately 28 miles from WVUH and 48 miles from Pittsburgh. According to the 2000 census, 189,316 people lived in Fayette and Greene counties.

3

of an out-of-state acute care general hospital in accordance with methods and standards applied to in-state hospitals for acute care services.

Since 1993, DPW and acute care general hospitals providing services paid by the Pennsylvania Medical Assistance Program ("the Program") have been parties to an agreement regarding rate increases for inpatient hospital services (the "Rate Agreement").  WVUH has been a signatory to the Rate Agreement since 1993. WVUH has provided, and continues to provide, a substantial amount of hospital care to Pennsylvania Medicaid recipients, including emergency and trauma care.  In each of the last several years, Pennsylvania Medicaid recipients made approximately 1538 patient visits to WVUH's emergency department.

Under the Program, acute care hospitals that treat a large volume of Medicaid and low income patients can qualify for disproportionate share hospital ("DSH") payments if they meet criteria for such payments.  The Program makes at least four DSH payments to acute care general hospitals: an inpatient DSH, an outpatient DSH, a community access/charity care DSH, and the Trauma DSH.  DPW treats WVUH as an in-state hospital for purposes of inpatient DSH, outpatient DSH, and community access/charity care DSH payments to WVUH.

In March 2004, the Pennsylvania legislature enacted the Pennsylvania Trauma Systems Stabilization Act ("Trauma Act"), 35 P.S. §§ 6943.1 *et seq.*, which authorizes the distribution of a new disproportionate share payment—the Trauma DSH—to hospitals accredited as a Level I, II, or III trauma center by Pennsylvania Trauma System Foundation ("the Foundation").  However, the statute limits the definition of "trauma center" to include only hospitals located within Pennsylvania. *See* 35 Pa. Cons. Stat. Ann. § 6943.2 (defining a hospital as "[a]n entity located in

4

this Commonwealth that is licensed as a hospital [under the] Health Care Facilities Act.")  Thus, because an out-of-state hospital that would otherwise meet the criteria for a Level I trauma center cannot be certified as such by the Foundation, it cannot receive Trauma DSH payments from Pennsylvania.[3]

Pursuant to the Trauma Act, on May 1, 2004, DPW, through the Secretary, gave notice of its intent to establish an additional class of inpatient disproportionate share payments to be distributed to hospitals located in Pennsylvania accredited as trauma centers by the Foundation.  The proposed Trauma DHS payment was approved by the Centers for Medicare and Medicaid Services and incorporated into the Pennsylvania State Plan.  The Trauma DSH is allocated based on a formula, generally as follows:  90% of available funds to hospitals accredited as Level I and Level II trauma centers and 10% to accredited Level III trauma centers. Approximately $24,867,000 was allocated and paid for Trauma DSH payments to Level I and Level II trauma centers for 2005.  More than half of that amount is funded by the Federal Government.

By correspondence to DPW, dated July 18, 2005, WVUH requested that DPW make the Trauma DSH funds available to the Hospital.  WVUH never received

---

[3] In establishing its accreditation standards for Level I trauma centers in Pennsylvania, the Trauma Act required the Foundation to adopt "at a minimum, the current guidelines for trauma centers as defined by the American College of Surgeons ("ACS") for Level I or Level II trauma centers."  35 Pa. Cons. Stat. Ann. § 6926(a)(1).  WVUH asserts that it has been certified as a Level I trauma center by West Virginia based on criteria approved by ACS, and that this status has been verified by the ACS. (Doc. 1 at ¶ 56-57.)  Additionally, WVUH maintains that it meets or exceeds all criteria required for certification as a Level I trauma center in Pennsylvania apart from in-state residency.  (*Id.* at ¶ 59-61.) Defendants claim that they lack information to verify these claims.  However, Defendants admit that they "failed and refused to treat plaintiff as an in-state hospital under the Trauma Act and to make Trauma DHS payments to plaintiff to the same extent that they make such payments to in-state hospitals," (Doc. 17 at ¶ 95) and that they treat "WVUH differently under the Trauma Act from similarly situated Pennsylvania hospitals with Level I trauma centers solely because WVUH is located outside the border of Pennsylvania." (*Id.* at ¶ 97.)

a written response to that correspondence.  On September 22, 2005, WVUH met

with, among others, Defendant James Hardy, and reiterated its request for Trauma

DSH payments.  The Defendants' position is that WVUH is not entitled to Trauma

DSH payments because it is not located within Pennsylvania, and they have made it

clear to WVUH that any further requests or efforts on the part of WVUH to secure

Trauma DSH payments would be futile.  Defendants have admitted that they treat

WVUH differently under the Trauma Act from similarly situated Pennsylvania

Hospitals with Level I trauma centers solely because WVUH is located outside the

border of Pennsylvania.

## C.   Procedural History

WVUH filed its complaint (Doc. 1) on January 11, 2006 seeking

declaratory relief and monetary damages for its Equal Protection, Commerce Clause,

Medicaid Act, § 1983, and judgment enforcement claims.[4]  Defendants filed their

answer (Doc. 17) on March 27, 2006.  On May 12, 2006, WVUH filed the instant

Motion for Summary Judgment and Motion to Enforce Judgment.  With permission

from the court, WVUH filed one brief in support of both motions.  On June 15, 2006,

Defendants filed a brief in opposition that addressed some of the issues raised in the

summary judgment motion (Doc. 34) and simultaneously filed a Motion for

Discovery Pursuant to Rule 56(f) (Doc. 32).[5]  On October 20, 2006, the court denied

---

[4] Plaintiff asks this court to declare the Trauma Act unconstitutional in violation of the Equal Protection and Commerce Clauses. Plaintiff also asks this court to declare that the Defendants' actions violate the Equal Protection Clause, Commerce Clause, § 1983, and the October 18, 1990 order. Finally, Plaintiff seeks reimbursement for all trauma disproportionate share payments that WVUH alleges it should have received pursuant to the October 18, 1990 order, including interest.

[5] Due to a clerical error, Defendants re-filed the opposition to the summary judgment motion
(continued...)

Defendants' Rule 56(f) motion[6] and ordered Defendants to file a supplemental opposition brief to address the remainder of WVUH's summary judgment arguments (Doc. 43).  Defendants did so on November 21, 2006 (Doc. 47).  WVUH filed its reply on January 10, 2007 (Doc. 54).  Thus, the issues have been fully briefed and this matter is ripe for disposition.

## II.        Legal Standard – Summary Judgment

_____Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.

---

[5] (...continued)
on June 16, 2007.

[6] Defendants claimed in their 56(f) motion that they were unable to respond to WVUH's Equal Protection and Commerce Clause claims without discovery on WVUH's accreditation, trauma capabilities, and disproportionate share payments received from other states.  The court denied Defendants' motion because Defendants did not sufficiently explain how this information would preclude summary judgment, particularly in light of the Defendants' admission that they treat "WVUH differently under the Trauma Act from similarly situated Pennsylvania hospitals with Level I trauma centers solely because WVUH is located outside the border of Pennsylvania." (*Id.* at ¶ 97.)

*Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

The court may undertake summary judgment review without additional discovery where the factual record is sufficiently developed to decide the relevant issues as a matter of law. *See, e.g.*, *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988) (holding that the district court did not err when it granted summary judgment on the record before it, notwithstanding plaintiff's request for additional discovery); *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 181-82 (3d Cir. 2003) (holding that because the district court's grant of controlling significance to a particular non-reliance clause was error, further development of the factual record

8

was required before making summary judgment determination); *Kovats v. Rutgers, the State Univ.*, 822 F.2d 1303, 1313-1314 (3d Cir. 1987) (finding that the issue of whether summary judgment prior to factual discovery was premature turned on posture of case, where "legal issues [were] inextricably intertwined with the factual issues").

**III.        Discussion**

WVUH asserts that Defendants' denial of Trauma DSH payments to WVUH solely on the basis of the hospital's out-of-state location violates Medicaid statutory and regulatory provisions, the Equal Protection Clause, and the Commerce Clause.  WVUH also seeks enforcement of this court's October 18, 1990 order, *W. Va. Univ. Hosps., Inc. v. Casey*, No. 86-cv-0955, slip op. (M.D. Pa. Oct. 18, 1990). These arguments will be addressed in turn.

**A.        42 U.S.C. § 1983 – Violation of Federal Law – Medicaid Statutory and Regulatory Provisions**

Plaintiff asserts that the Pennsylvania State Plan violates the Medicaid Act because it fails to adequately provide for services to Pennsylvania residents who are absent from the state in accordance with 42 U.S.C. § 1396a(a)(16).  Before the court can address whether the Plan violates § 1396a(a)(16), it must first address the threshold question of whether § 1396a(a)(16) confers an enforceable federal right under 42 U.S.C. § 1983.

Section 1983[7] can provide a remedy for violations of federal statutes, as well as constitutional violations. *Suter v. Artist M.*, 503 U.S. 347, 355 (1992) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)). Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights established "elsewhere in the Constitution or the federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996); *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992) (Section 1983 "does not provide a remedy for abuses that do not violate federal law."). Moreover, "§ 1983 is not available to enforce a violation of a federal statute 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Suter*, 503 U.S. at 355-56 (quoting *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423 (1987)).

To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution and laws of the United States and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to

---

[7]Section 1983 provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini*, 212 F.3d at 806 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).  Importantly, redress through § 1983 is only available where a plaintiff asserts the violation of "a federal *right*, not merely a violation of federal law." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

Three factors guide the court's inquiry into whether a statutory provision confers a federal right: (1) whether Congress intended that the relevant provision benefit the plaintiff; (2) whether the plaintiff has demonstrated that the asserted right is not "so 'vague and amorphous'" that enforcement is beyond the competence of the judiciary; and (3) whether the statute "unambiguously impos[es] a binding obligation on the States." *Id.* at 340-41 (internal citations omitted). Defendants argue that Plaintiff has no right to sue for Trauma DSH payments because WVUH is not an intended beneficiary of § 1396a(a)(16) and, even if it were an intended beneficiary, the statute is vague, amorphous, and ambiguous.  (Doc. 34 at 6.) Thus the court's review focuses on *Blessing*'s first two prongs.[8]

Defendants argue that Medicaid beneficiaries, and not Medicaid providers, are the intended beneficiaries § 1396a(a)(16).  That section provides:

> A State plan for medical assistance must– . . .
> provide for inclusion, to the extent required by regulations
> prescribed by the Secretary, of provisions (conforming to
> such regulations) with respect to the furnishing of medical
> assistance under the plan to individuals who are residents
> of the State but are absent therefrom.

---

[8] The court notes that § 1396a(a) begins with the phrase "A State plan for medical assistance *must*," which consequently applies to every subsection.  42 U.S.C. § 1396a(a) (emphasis added). Accordingly, there is no question that § 1396a(a)(16) is phrased in mandatory terms, thus imposing a binding obligation on the State and satisfying *Blessing*'s third prong.

42 U.S.C. § 1396a(a)(16).  No other court has examined the language of §
1396a(a)(16) in this context.  However, § 1396a(a)(8) contains very similar
language[9] and has been examined by the Eleventh Circuit in *Doe v. Chiles*, 136 F.3d
709, 715-16 (11th Cir. 1998).  The *Chiles* court concluded without hesitation that the
plain language of § 1396a(a)(8) satisfied the first *Blessing* requirement, but only with
respect to Medicaid recipients.  *Id.* at 715.  The "individuals who are residents of the
State" language in § 1396a(a)(16) is substantively identical to the "eligible
individuals" language in § 1396a(a)(8)'s reasonable promptness clause.  Thus, it is
clear that individual Medicaid recipients are intended beneficiaries of §
1396a(a)(16).

WVUH argues that medical providers are also intended beneficiaries of
§ 1396(a)(8).  It points to the clause, "with respect to the furnishing of medical
assistance under the plan to individuals" in support of that claim.  (Doc. 54 at 22.)
However, § 1396a(a)(8) includes similar "furnishing" language.  The *Chiles* court
squarely rejected the contention that the "furnishing" language of the provision
conveyed an intent to benefit providers.  *Id.* at 715 n.13.

Additionally, § 1396a(a)(16) is distinguishable from § 1396a(a)(8) in
that it includes the qualification "to the extent required by regulations prescribed by
the Secretary."  The regulations for subsection (a)(16)[10] directly provide for

---

[9]Section 1369a(a)(8) provides that "[a] State plan for medical assistance must . . . provide
that all individuals wishing to make application for medical assistance under the plan shall have
opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all
eligible individuals."  42 U.S.C. § 1396a(a)(8); *see Chiles*, 136 F.3d at 715.

[10]The regulations provide:

(continued...)

12

reimbursement to providers, unlike the corresponding regulations for subsection (a)(8), suggesting that medical providers are intended beneficiaries under the regulations.[11]   However, parties may not enforce regulations under § 1983 when they go beyond the scope provided for by Congress in the statute.  *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 424 (3d Cir. 2004).  The plain language of the statute simply does not rise to the level of an unambiguously conferred right to providers.  In light of the Supreme Court's reluctance to find an enforceable right absent an unambiguously conferred right, *see, e.g., Gonzaga Univ. v. Doe*, 536 U.S. 273, 280-283 (2002); *Sabree v. Richman*, 367 F.3d 180, 184 (3d Cir. 2004), the court concludes that the "regulations clause" fails to establish that providers are intended beneficiaries of § 1396a(a)(16).  The implementing regulations do not alter this conclusion.

Accordingly, because § 1396a(a)(16) does not confer an enforceable federal right under 42 U.S.C. § 1983, the court will deny WVUH's summary

---

[10](...continued)
A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a recipient who is a resident of the State, and any of the following conditions is met:
(1) Medical services are needed because of a medical emergency;
(2) Medical services are needed and the recipient's health would be endangered if he were required to travel to his State of residence
(3) The State determines, on the basis of medical advice, that the needed medical services, or necessary supplementary resources, are more readily available in the other State;
(4) It is general practice for recipients in a particular locality to use medical resources in another State.

42 C.F.R. § 431.52(b).

[11]*See Chiles*, 136 F.3d at 714.

judgment motion with respect to the claim that the Trauma Act is contrary to federal Medicaid statutory and regulatory provisions.

   **B.     42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection**

   WVUH also asserts that Defendants have violated the Equal Protection Clause of the Fourteenth Amendment by treating WVUH differently from similarly situated Level I trauma centers in Pennsylvania with respect to Trauma DSH payments solely because it is located out-of-state.  Unlike Plaintiff's claim under the Medicaid regulations, Fourteenth Amendment rights may be enforced pursuant to 42 U.S.C. § 1983.

   The Equal Protection Clause of the Fourteenth Amendment protects against arbitrary government action by requiring similar treatment of those who are similarly situated.  U.S. Const. amend. XIV, § 1; *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 439 (1985); *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  When the state makes a classification based on economics or social welfare—as opposed to a suspect class such as race, gender, or national origin—rational basis is the appropriate standard of review.  *Dandridge v. Williams*, 397 U.S. 471, 485 (1970); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974); *Matthews v. De Castro*, 429 U.S. 181, 185 (1976); *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981).  Under this standard, the challenger bears the burden of demonstrating either that the law has no legitimate purpose, or that the means used to achieve its purpose are not rationally related to that purpose.  There is a strong presumption of validity in favor of laws challenged under rational basis, *see McGowan v. Md.*, 366 U.S. 420, 425-26 (1961), and government action is not unconstitutional so long as "the law [is] reasonable, not

arbitrary, and bears a rational relationship to a permissible state objective." *Village of Belle Terre*, 461 U.S. at 8.

Here, WVUH asserts that Defendants have no rational basis for discriminating against it with respect to Trauma DSH payments. Defendants respond that the purpose of the Trauma Act—to provide for "the availability of and access to a comprehensive trauma care system" for Pennsylvania residents, *see* 35 Pa. Cons. Stat. § 6943.1 (2004)—constitutes a legitimate state interest justifying denial of payment to all out-of-state hospitals without regard to the number of Pennsylvania Medicaid residents they may serve. (Doc. 47 at 15.) While improving access to trauma care is certainly a legitimate and admirable goal, Defendants do not and cannot explain how this goal is furthered by denying Trauma DSH payments to all out-of-state hospitals across the board, including hospitals such as WVUH which treat a significant number of Pennsylvania residents.

Even under the deferential rational basis standard, state laws discriminating against out-of-state residents and businesses have been viewed with particular skepticism by the courts. *See, e.g.*, *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1985); *Williams v. Vermont*, 472 U.S. 14 (1985) (invalidating a vehicle tax scheme that distinguished between residents who purchased a vehicle before moving to the state, and those who purchased a vehicle while residents of the state). In *Metropolitan Life Insurance Co.*, the Supreme Court struck down a state law imposing a higher tax on out-of-state insurance companies, stating that "whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on

15

domestic corporations, unless the discrimination bears a rational relation to a legitimate state purpose."  470 U.S. at 875.  The Court went on to conclude that improving the local economy did not constitute a legitimate purpose, where that goal was achieved by disadvantaging out-of-state businesses.  *Id.* at 882.

In the context of Medicaid reimbursement, courts have struck down state payment schemes which discriminate against out-of-state hospitals serving state residents.  In *West Virginia University Hospitals v. Casey*, this court held that Pennsylvania violated the Equal Protection Clause by reimbursing out-of-state hospitals at a lower rate than in-state hospitals for Medicaid care for Pennsylvania residents.  701 F. Supp. 496, 518-20 (M.D. Pa. 1988), *rev'd in part on other grounds* by 885 F.2d 11 (3d Cir. 1989), *rev'd on other grounds by* 499 U.S. 83 (1991).  In that case, the state argued that the lower reimbursement was justified because "certain incentives for growth, quality of care, and availability, e.g., special payments for medical education costs, were not warranted for out-of-state facilities because the return on such incentive payments was not as significant as from such payments to in-state hospitals."  *Id.* at 520.  However, this court concluded that there was no rational connection between this interest and the reimbursement policy because the state failed to consider the impact of the policy on out-of-state hospitals like WVUH, which served a large number of Pennsylvania residents.  *Id.*

Other courts considering Equal Protection Clause challenges to discriminatory Medicaid plans have reached similar conclusions.  In *Children's Seashore House v. Waldman*, the Third Circuit held that the denial of Medicaid DSH payments to out-of-state hospitals may violate the Equal Protection Clause.  197 F.3d 654, 661-62 (3d Cir. 1999); *see also Children's Hosp. & Med. Cntr. v. Bonta*, 97

16

Cal. App. 4th 740 (Cal. Ct. App. 2002) (holding that California violated the Equal Protection Clause by reimbursing out-of-state hospitals at a lower rate than in-state hospitals for Medicaid care for California residents).

Defendants cite *Board of Education of Kentucky Annual Conference of the Methodist Episcopal Church v. Illinois*, 203 U.S. 553 (1906), in support of their claim that discrimination against out-of-state hospitals does not violate the Equal Protection Clause.  In that case, the Supreme Court upheld a state probate scheme which provided a tax exemption for in-state charitable bequests while denying the exemption to out-of-state charities.  *Id.*  The Court reasoned that Illinois was justified in denying the exemption to a Kentucky charity because that charity did not provide a benefit to Illinois residents.  *Id.* at 563.  By contrast, here Defendants have denied Medicaid payments to an out-of-state hospital *which serves Pennsylvania residents*. Thus *Board of Education of Kentucky* is not controlling in this case.

Defendants' denial of Trauma DSH payments to all out-of-state hospitals fails rational basis review.  The classification at issue here is a distinction between in-state and out-of-state hospitals providing trauma treatment to Pennsylvania residents.  The state's proffered justification—improvement of access to trauma care for Pennsylvania residents—is not rationally related to the denial of the Trauma DSH payment to all out-of-state hospitals.  Pennsylvania residents are routinely treated at out-of-state hospitals that are closer to their homes than Pennsylvania hospitals, or which are more capable of addressing their medical needs than Pennsylvania hospitals.  Accordingly, because there is no rational relationship between improving access to trauma care, and the denial of Trauma DSH payments

17

to out-of-state hospitals, the court will grant summary judgment in favor of WVUH
on the equal protection claim.

### C.    42 U.S.C. § 1983 – Commerce Clause

Plaintiff also asserts that the Trauma DSH payment scheme violates the
dormant Commerce Clause by discriminating against out-of-state hospitals which
treat a disproportionate share of Pennsylvania Medicaid patients.  Defendants argue
that the payment scheme is not subject to the Commerce Clause because it is a
permissible subsidy to domestic industry.  In the alternative, Defendants claim that
even if the payments are subject to the Commerce Clause, the denial of payments to
out-of-state hospitals is justified.  These arguments will be addressed in turn.

### 1.   Applicability of the Market Participant / Subsidies Exception

The Commerce Clause provides, in relevant part: "The Congress shall
have Power . . . [t]o regulate Commerce . . . among the several States."  U.S. Const.
art. I, § 8.  The Commerce Clause both permits Congress to regulate commerce
among the States and "also directly limits the power of the States to discriminate
against interstate commerce."  *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269,
273 (1988).  This limitation on the states, the "dormant" Commerce Clause, prohibits
states from enacting laws that "benefit in-state economic interests by burdening out-
of-state competitors."  *Id.*

Defendants admit that the sole reason they treat WVUH differently
under the Trauma Act from similarly situated Pennsylvania hospitals with Level I
trauma centers is because WVUH is an out-of-state provider.  (Compl., Doc. 1 ¶ 97;
Answer, Doc. 17 ¶ 97.)   However, Defendants contend that this discrimination is
permissible because the Trauma DSH payments constitute a direct subsidy to in-state

18

hospitals, and thus fall within a "subsidies" exception to the Commerce Clause. (Doc. 47 at 7-9.)  According to Defendants, Trauma DSH payments "simply do not involve the kind of action with which the Commerce Clause is concerned" (Doc. 47 at 8), but instead are "examples of the State's philanthropy intended for hospitals which provide benefits within the Commonwealth's borders." (Doc. 47 at 10.)

 Defendants' argument appears to be rooted in the market participant exception to the Commerce Clause, which permits a state to favor its own citizens when it acts as a participant in the market, and not as a regulator.  *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976); *see also Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) (upholding the right of a state-owned cement company to charge a lower rate for domestic purchasers).  In *Hughes*, the first Supreme Court case to recognize the market participant exception, Justice Stevens noted in a concurring opinion that "[i]t is important to differentiate between commerce which flourishes in a free market and commerce which owes its existence to a state subsidy program."  *Id.* at 815 (Stevens, J. concurring).  In a later case, *West Lynn Creamery v. Healy*, the Supreme Court stated, in dicta, that "[a] pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business."  512 U.S. 186, 199 (1994).

 The Supreme Court has never directly ruled on the issue of the constitutionality of subsidies.  *See id.* at 199 n.4.  Nevertheless, even assuming that such an exception exists, Defendants' characterization of the Trauma DSH payments as a permissible subsidy for domestic industry is untenable.  The Trauma DSH payments are neither funded purely by state revenue, nor are they voluntary.  Rather, as a component of Pennsylvania's State Plan for Medicaid, the Trauma DSH

payments are jointly funded by Pennsylvania and the federal government. Additionally, having incorporated Trauma DSH payments into their State Plan for Medicaid, Defendants may not choose to withhold these payments in contravention of that plan.  As the name "Trauma DSH" suggests, these payments are a form of compensation for hospitals which provide a disproportionate share of trauma treatment for Medicaid patients.  These payments simply cannot be described as a state vehicle for subsidization of Pennsylvania hospitals.[12]  Thus, the Trauma DSH payments do not fall within the market participant exception to the dormant Commerce Clause.

## 2.   **Dormant Commerce Clause Analysis**

Having established that the Trauma DSH payments are subject to the Commerce Clause, the next issue is whether they run afoul of it.  Dormant Commerce Clause violations are identified by a two-step inquiry.  *Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 797 (3d Cir. 1995).  The first step is to determine whether the law discriminates against interstate commerce either on its face or in practical effect.  *Id*.  If the law discriminates, it is *per se* invalid and will be struck down unless the state demonstrates, under rigorous scrutiny, that the law serves a legitimate purpose "and that this purpose could not be served as well by

---

[12] Even if the court were to accept that Trauma DSH payments are subsidies rather than compensation, the Supreme Court has expressly prohibited states from benefitting domestic industry at the expense of out-of-state businesses.  In *West Lynn Creamery*, the Supreme Court invalidated a state statute which used the proceeds from a tax on all dairy products to provide a subsidy to in-state milk producers.  *Id.*  In doing so, the Court held that the subsidy violated "the cardinal principle that a State may not 'benefit in-state economic interests by burdening out-of-state competitors.'" *Id.*  Similarly, in *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 277 (1988), the Court held that denial of a tax credit for out-of-state producers of ethanol violated the Commerce Clause.  Here, as Plaintiff points out, "Trauma DSH payments do not merely 'assist local business.'  Rather they burden WVUH by requiring it to shoulder the cost of providing trauma care to Pennsylvania Medicaid patients without the benefit of the rate adjustment that equivalent Pennsylvania hospitals receive." (Doc. 54 at 12.)

20

available nondiscriminatory means."  *Id.*; *see also Hughes v. Okla.*, 441 U.S. 322, 337 (1979) ("At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives.").

The Trauma Act discriminates on its face against out-of-state hospitals. Under the Trauma Act, Trauma DSH payments authorizes payments only "to each accredited Level I, Level II or Level III trauma center. . .", 35 Pa. Cons. Stat. Ann. § 6943.5(a), which are defined to include only in-state hospitals.[13]  This statutory scheme excludes all out-of-state hospitals from Trauma DSH payments, thus benefitting in-state providers while burdening providers located outside Pennsylvania.  The Trauma Act is thus subject to the *per se* rule of invalidity.

Defendants attempt to overcome this presumption of invalidity by claiming that the Trauma Act serves a legitimate purpose—"provid[ing] for the availability of and access to a comprehensive trauma care system for Pennsylvania citizens."  (Doc. 47 at 12.)  While improving access to trauma care for Pennsylvania citizens is certainly an important and legitimate objective, Defendants do not explain how this goal is furthered by denying payments to out-of-state hospitals.  In fact, by denying Trauma DSH payments to out-of-state hospitals which provide trauma care to a significant number of Pennsylvania residents, Defendants appear to be doing the opposite.  In light of Defendants' characterization of the payments as "examples of the State's philanthropy intended for hospitals which provide benefits within the

---

[13] The Trauma Act defines a trauma center as "[a] hospital accredited as a Level I, Level II or Level III trauma center by the Pennsylvania Trauma System Foundation. . ." and a "hospital" as "[a]n entity *located in this Commonwealth* that is licensed as a hospital. . . ."  35 Pa. Cons. Stat. Ann. § 6943.2 (emphasis added).

Commonwealth's borders," (Doc. 47 at 10), it is clear that the true purpose of denying Trauma DSH payments to out-of-state hospitals is to benefit in-state hospitals at the expense of out-of-state hospitals.

Nor have Defendants explained how the Trauma DSH payment scheme's purpose cannot be served by the nondiscriminatory means of making payments to out-of-state hospitals like WVUH that provide trauma care to significant numbers of Pennsylvania residents.  Essentially, Defendants assert—without further explanation—that the "stated purpose of providing 'for the availability of and access to a comprehensive trauma care system' for Pennsylvania citizens cannot be served as well by distributing scarce resources to hospitals outside the Commonwealth." (Doc. 47 at 13.)  This bare assertion is insufficient to overcome the presumption of invalidity that attaches to laws discriminating against interstate commerce.  *Cf. Maine v. Taylor*, 477 U.S. 131 (1986) (upholding a state ban on importation of bait fish where the state demonstrated that there was no other adequate means to prevent the spread of invasive aquatic species).  Defendants' discrimination against out-of-state hospitals with respect to Trauma DSH payments violates the dormant Commerce Clause.

### D.   Violation of October 18, 1990 Court Order / Enforcement

Plaintiff also seeks enforcement of the court's October 18, 1990 order in *W. Va. Univ. Hosp. v. Casey*, No. 86-cv-0955, slip op. (M.D. Pa. Oct. 18, 1990).  In that order, Defendants were required to "treat WVUH as an in-state hospital for purposes of determining Pennsylvania's medical assistance reimbursement for acute care general hospital services." *Id.* at ¶ 1.  The order further provided that "Medicaid payments to WVUH shall include such increased rates as may be paid to in-state

22

hospitals from time to time, as a consequence of litigation, in conformity with federal law." *Id.* at ¶ 3.  Additionally, the order stated that "[it] is no bar to future changes in the payment methodology so long as such changes conform with federal law." *Id.* at ¶ 4.

It has been seventeen years since the issuance of that order. Additionally, the type of Medicaid payment at issue in this case—Trauma DSH—did not exist at the time that order was issued.  In light of the passage of time and changed circumstances, and the fact that the court finds that the Trauma DSH payment scheme is unconstitutional under the Equal Protection Clause and the Commerce Clause, this court will decline to enforce its prior judgment in this case. Accordingly, Plaintiff's Motion to Enforce Judgment will be denied.

**IV.**        <u>**Conclusion**</u>

For the foregoing reasons, the court will grant the summary judgment motion of WVUH (Doc. 22) and deny the Motion to Enforce Judgment.  (Doc. 25.) An appropriate order will issue.

S/Sylvia H. Rambo
United States District Judge

Dated:  November 5, 2007.

23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,** | : | **Civil No. 1: CV-06-0082** |
|  | : |  |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **EDWARD G. RENDELL, Governor of the Commonwealth of Pennsylvania, et al.,** | : |  |
|  | : |  |
| **Defendants.** | : |  |

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) Plaintiff WVUH's Motion for Summary Judgment (Doc. 22) is **GRANTED**;

2) Plaintiff WVUH's Motion to Enforce Judgment (Doc. 25) is **DENIED**;

3) Judgment is hereby **GRANTED** in favor of WVUH; and

4) Entry of judgment is **DEFERRED** pending further order of this court.

S/Sylvia H. Rambo
United States District Judge

Dated:  November 5, 2007.